IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                       **Case No. 10-40111-01-RDR**

HERIBERTO GONZALEZ-GARCIA,

        Defendant.

## MEMORANDUM AND ORDER

This matter is presently before the court upon defendant's motion to suppress. Having carefully reviewed the arguments of the parties, the court is now prepared to rule.

The defendant is charged in a one-count indictment with possession with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine in violation of 18 U.S.C. § 841(a)(1). The charge arises out of a traffic stop on October 21, 2010 in Geary County, Kansas.

The court initially conducted a hearing on defendant's motion on February 3, 2011. The court heard from one witness at that hearing, Kansas Highway Patrol trooper Josiah Trinkle. At the conclusion of the hearing, the defendant asked for additional time to consider several issues that had arisen during the hearing. Specifically, the defendant asked the government for some further discovery on several matters. The court agreed to continue the hearing based upon the request of the defendant. The court

conducted another hearing on February 11, 2011. The court heard additional testimony from Trooper Trinkle. Following the hearing, the court asked the parties to provide additional memoranda on an issue that arose at the February 11th hearing. Since that time, the court has received the requested briefs and is now prepared to issue findings of fact and conclusions of law.

**FINDINGS OF FACT**

1. On October 21, 2010, Kansas Highway Patrol (KHP) trooper Josiah Trinkle was patrolling eastbound on Interstate 70 in Geary County. Trooper Trinkle has been employed with the KHP for three years. He had no law enforcement experience prior to his work for the KHP. He has received training on interdiction while employed with the KHP and has been involved in approximately 60 to 70 interdiction stops in the past three years.

2. The driving conditions on October 21st were excellent. It was sunny and the sky was clear. There was a light wind. In the area where Trooper Trinkle was patrolling, I-70 is straight, flat and without obstacles.

3. Trooper Trinkle's patrol car is equipped with a video camera. When the emergency lights are activated, the camera begins to produce a video record beginning with the last thirty seconds prior to the activation of the emergency lights. The audio portion of the video is available shortly after the emergency lights are activated.

4. At approximately 10:15 a.m., Trooper Trinkle stopped a 1994 Honda Accord driven by Ramon Morales. The stop occurred near milepost 309. Morales appeared to be Hispanic and was driving a vehicle with a Tennessee license tag. Trooper Trinkle purportedly stopped him for failing to maintain a single lane of travel. After Trooper Trinkle approached the car, Morales told Trooper Trinkle that he did not speak English. Trooper Trinkle asked for his license and proof of insurance. He further asked him where he was going. He told the driver that he had crossed the white line. Trooper Trinkle then returned to his patrol car. As he was about to enter his car, he noticed a Toyota Matrix drive by. Trooper Trinkle was immediately suspicious of the car because it (1) was a vehicle that commonly had hidden compartments; and (2) had a Utah license plate. He testified that he was unable to determine the race of the driver.

5. Trooper Trinkle did not seek any information on the Honda's license plate or Morales' driver's license. Rather, he quickly wrote a warning ticket and provided it to the driver. He simply said, "Okay. Good day." He left the Honda quickly and returned to his patrol car. The period of time from when Trooper Trinkle noticed the Toyota Matrix to the time that he ultimately left the scene of the stop of the Honda was about two minutes.

6. Trooper Trinkle then traveled at a high rate of speed to catch up to the Toyota Matrix. Trooper Trinkle could not remember

3

how fast he traveled but he acknowledged that he "did hurry." He indicated that he may have been traveling at least 109 miles per hour. He noted that his car has the capability to travel at a rate of 147 miles per hour.

7. Trooper Trinkle eventually saw the Toyota Matrix. He followed the car for a period of one mile. During that time, he testified that he saw the car travel over the fog line, the white line on the right side of the road, twice and touch the fog line once. He pulled up to the side of the car, purportedly to see if the driver was wearing his seat belt. He then pulled in behind him and turned on his emergency lights. The car pulled over to the side of the road quickly near milepost 315 at approximately 10:24 a.m.

8. Trooper Trinkle approached the car from the passenger side. He said, "Hello, do you have your driver's license and proof of insurance?" The driver produced a Mexican driver's license and proof of insurance. He also asked the driver, who was subsequently identified as Heriberto Gonzalez-Garcia, where he was going. Trooper Trinkle asked Gonzalez-Garcia this question in both English and Spanish. Gonzalez-Garcia had some understanding of English, but it was clear that Spanish was his native language. Gonzalez-Garcia indicated that he was traveling to Wichita. Trooper Trinkle found the destination odd because the turn to travel south to Wichita off of I-70 was in Salina, sixty-five miles west of the

4

stop. Gonzalez-Garcia further indicated that he was traveling from Los Angeles. Trooper Trinkle told him that he had traveled over the white line. He asked Gonzalez-Garcia if he had anything to drink and he replied, "No." Trooper Trinkle noticed several energy drinks in the vehicle. This was indication to Trooper Trinkle that Gonzalez-Garcia was driving long hours. Trooper Trinkle further noticed a strong odor of air freshener coming from the inside of the car. Trooper Trinkle then returned to his patrol car and sought information on Gonzalez-Garcia's license and the Utah license plate. He learned that there was no negative history on either the driver's license or the license plate. Trooper Trinkle did notice, however, that the Toyota was not registered or insured in the defendant's name.

9. Trooper Trinkle wrote out a warning ticket for Gonzalez-Garcia for failure to maintain a single lane of travel. He returned to the Toyota and provided the warning ticket to Gonzalez-Garcia. Trooper Trinkle explained that it was just a warning and not a ticket. Trooper Trinkle said, "So just try to keep it in your lane, alright? You drive safe." He then left the window and began to walk away. After he had gotten to the end of the car, he quickly returned and said, "Can I ask a few more questions?" Gonzalez-Garcia responded, "Okay."

10. Trooper Trinkle again asked if he was traveling to Wichita. Gonzalez-Garcia told him again he was traveling to

Wichita. Trooper Trinkle informed him that he had missed his turn. Gonzalez-Garcia said he was traveling to Wichita to look for work. He told Trooper Trinkle that he had a cousin in Wichita. He also told him that he was living in Salt Lake City, Utah. Trooper Trinkle then asked if he had ever been arrested or had anything illegal in the car. Gonzalez-Garcia responded in the negative to both questions. Trooper Trinkle then asked if could search the car. Again, he asked in English and in Spanish. Trooper Trinkle then asked, "Is it okay?" Gonzalez-Garcia responded, "Inside the car?" Trooper Trinkle initially said, "What?" Trooper Trinkle then responded, "Yes." Trooper Trinkle again asked, "Is it okay?" Gonzalez-Garcia then exited the vehicle. Trooper Trinkle understood Gonzalez-Garcia's action to exit the car as permission to search it. During this encounter, Trooper Trinkle used a conversational tone and was not hostile in any fashion. Trooper Trinkle had Gonzalez-Garcia stand at the front of the car on the passenger side by the shoulder to the highway. Gonzalez-Garcia stood there quietly while Trooper Trinkle began to search the car.

11. Trooper Trinkle and Gonzalez-Garcia were able to communicate during the stop. Gonzalez-Garcia generally seemed to understand what was being asked of him. He appeared to understand much of the English used by Trooper Trinkle. On the few occasions where there was some difficulty, Trooper Trinkle made efforts to clarify the questions so that Gonzalez-Garcia would understand.

6

Trooper Trinkle spoke in both English and Spanish. He was able to use some Spanish during the encounter, but most of his questions were in English. Trooper Trinkle spoke in a conversational tone during the entire traffic stop. He was polite and respectful.

12. In order to begin the search, Trooper Trinkle removed his hat and put on gloves. He began by searching the rear of the car. He saw a gas can filled with gasoline and some spray-on aerosol sealant. These discoveries led him to request additional help. He found the presence of the gas can unusual because most people do not carry one in their car. Moreover, he knew that some drug couriers carried a gas can because narcotics are often carried in the gas tank. The sealant suggested to him that the car might contain an after-market compartment because the sealant was often used to conceal such hidden areas. As Trooper Trinkle continued to search, other law enforcement personnel arrived on the scene.

13. One of the other officers discovered that the heat shield above the exhaust had been removed and replaced with rivets. This discovery also suggested a hidden compartment because the work did not look like it had been performed by a professional. The officers began to focus on the heat shield. This led them to check the center console between the driver and front passenger seat. They noticed that the bolts holding the console were heavily tooled. The heavy tooling was an indication that the console had been removed and replaced. The officers believed that the hidden

compartment was in that area. They removed the console and found an old license plate underneath it. The removal of the license plate led to the discovery of a hidden compartment below. In that compartment, they found approximately three pounds of methamphetamine. Thereafter, Gonzalez-Garcia was arrested.

14. Following the discovery of the methamphetamine and the arrest of Gonzalez-Garcia, Trooper Trinkle told the other officers: "He went by while I was going back to write a warning."

**CONCLUSIONS OF LAW**

1. Gonzalez-Garcia raised a number of arguments in his motion to suppress. During the suppression hearing and afterwards, Gonzalez-Garcia focused primarily on whether the government had successfully demonstrated that Trooper Trinkle had reasonable suspicion to stop him. He suggested that the circumstances showed that Trooper Trinkle had not observed his car travel across the fog line prior to the stop. He argued that Trooper Trinkle had engaged in a "profile" stop of his vehicle without seeing any traffic violation. In the alternative, Gonzalez-Garcia contends that Trooper Trinkle's high rate of speed in approaching his vehicle caused him to cross the fog line.

2. To lawfully initiate a traffic stop, "the detaining officer must have an objectively reasonable articulable suspicion that a traffic violation has occurred or is occurring." United States v. Soto, 988 F.2d 1548, 1554 (10th Cir. 1993). Thus, the

constitutionality of an initial stop depends upon whether the detaining officer "had reasonable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction." United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995) (en banc) (internal quotation marks omitted).

3. The alleged traffic violation here was K.S.A. 8-1522(a), which provides that "[w]henever any roadway has been divided into two (2) or more clearly marked lanes for traffic, . . .[a] vehicle shall be driven as nearly as practicable entirely within a single lane." This court has had ample opportunities to consider this statute. See United States v. Cruz-Chavez, No. 10-40055-01/02, 2010 WL 3270106 at * 5 (D.Kan. 2010) (citing cases). In general, an officer's observation of a vehicle straying out of its lane multiple times over a short distance creates reasonable suspicion that the driver violated K.S.A. 8-1522(a) so long as the strays could not be explained by "adverse physical conditions" such as the state of the road, the weather, or the conduct of law enforcement. United States v. Cline, 349 F.3d 1276, 1287 (10th Cir. 2003); United States v. Zabalza, 346 F.3d 1255, 1258-59 (10th Cir. 2003); United States v. Ozbirn, 189 F.3d 1194, 1198 (10th Cir. 1999). The particular facts and circumstances of each case determine the result. Cline, 349 F.3d at 1287.

4.  The particular facts of this case are troubling to the court. The court notes the following unusual circumstances: (1) the "coincidence" that Trooper Trinkle stopped two cars within ten minutes of each other that were driven by Hispanics with out-of-state tags for failure to maintain a single lane of travel; (2) the "interest" displayed by Trooper Trinkle in stopping the Toyota after he viewed the car while in the process of conducting another stop; and (3) the continued use of the violation of failure to maintain a single lane of travel to stop out-of-state vehicles. Some of these issues were recently addressed in a law review article by Professor Melanie Wilson of the University of Kansas School of Law. See Wilson, "You Crossed the Fog Line!" – Kansas, Pretext, and the Fourth Amendment, 58 Kan.L.Rev. 1179 (2010).

5.  The court is aware that the reasonableness of traffic stops under the Fourth Amendment does not depend on the actual motives of the law enforcement officer. See Whren v. United States, 517 U.S. 806, 813 (1996) ("'[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.'") (quoting Scott v. United States, 635 U.S. 128, 138 (1978)); United States v. Callerman, 273 F.3d 1284, 1286 (10th Cir. 2001) ("When determining whether an officer possessed a reasonable articulable suspicion,

10

the subjective motivations of an arresting officer are irrelevant."). Nevertheless, the court can consider the officer's motivation in assessing his or her credibility. United States v. Wilkinson, No. 10-6024, 2011 WL 135787 at * 4 (10th Cir. Jan. 18, 2011).

6. The only evidence offered on the alleged violation came from Trooper Trinkle. Thus, the bottom line is whether the court found Trooper Trinkle's testimony concerning the violation of K.S.A. 8-1522(a) credible. Having carefully considered his testimony as well as the unusual circumstances, the court finds Trooper Trinkle's testimony credible on this issue. Trooper Trinkle may have had other motives, but he testified clearly on the alleged violation. He testified that within the distance of approximately one mile he saw the Toyota cross over the fog line on two occasions and run onto the fog line a third time. He may have been traveling at a high rate of speed, but there was nothing to preclude an accurate observation of the Gonzalez-Garcia vehicle. The existing circumstances, i.e., the weather and the road conditions, failed to provide any explanation for the movement of the Toyota over the fog line. In addition, the court finds no credible evidence that the actions of Trooper Trinkle, i.e., his high rate of speed in approaching the Toyota, caused Gonzalez-Garcia to weave or cross the fog line. Therefore, the court believes that Trooper Trinkle had objective reasonable suspicion

11

that K.S.A. 8-1522(a) had been violated. Given this finding, the court holds that the initial stop of the Toyota was justified and reasonable.

7. The court shall next turn to the other arguments raised by Gonzalez-Garcia. He contends that he was detained beyond the permissible scope of the stop. He suggests that Trooper Trinkle gave him no opportunity to leave after he issued him the warning ticket. The government has suggested that Trooper Trinkle and Gonzalez-Garcia engaged in a consensual conversation after the warning ticket was issued.

8. During a routine traffic stop, the detaining officer is permitted to ask such questions, examine such documentation, and run such computer verifications as necessary to determine that the driver has a valid license and is entitled to operate the vehicle. United States v. Miller, 84 F.3d 1244, 1250 (10th Cir.), cert. denied, 519 U.S. 985 (1996). The officer may detain the driver and his vehicle as long as reasonably necessary to make these determinations and to issue a citation or warning. United States v. Martinez, 983 F.2d 968, 974 (10th Cir. 1992), cert. denied, 508 U.S. 922 (1993). However, if the officer wants to detain the driver for further questioning, he may do so if "(1) 'during the course of the traffic stop the officer acquires an objectively reasonable and articulable suspicion that the driver is engaged in illegal activity;' or (2) 'the driver voluntarily consents to the

officer's additional questioning.'" United States v. Elliott, 107 F.3d 810, 813 (10th Cir. 1997) (quoting United States v. Sandoval, 29 F.3d 537, 540 (10th Cir. 1994)).  If the officer continues to question the driver in the absence of either of these two circumstances, then "any evidence derived from that questioning (or a resulting search) is impermissibly tainted in Fourth Amendment terms."  Id. (internal quotations and citation omitted).

9.  Following the initial conversation and after checking the license and license plate, Trooper Trinkle returned to the Toyota and provided Gonzalez-Garcia with the documents he had provided and a copy of the warning ticket.  He terminated the encounter by telling Gonzalez-Garcia to drive safely.

10.  A traffic stop may evolve into a consensual encounter, for "[o]nce the officer has returned the driver's documents, further questioning amounts to an unlawful detention only if the driver has objectively reasonable cause to believe that he is not free to leave."  United States v. Chavira, 467 F.3d 1286, 1290 (10th Cir. 2006).  "'Whether an encounter can be deemed consensual depends on whether the police conduct would have conveyed to a reasonable person that he or she was not free to decline the officer's requests or otherwise terminate the encounter.'"  United States v. Bradford, 423 F.3d 1149, 1158 (10th Cir. 2005) (quoting United States v. West, 219 F.3d 1171, 1176 (10th Cir. 2000)).  Under this standard, "an officer is not required to inform a suspect that

13

she does not have to respond to questioning or that she is free to leave." Id. A court looks at whether the officer made any "coercive show of authority, such as the presence of more than one officer, the display of a weapon, physical touching by the officer, or his use of a commanding tone of voice indicating that compliance might be compelled suggesting that the detention had not ended." Id. at 1159 (internal quotation marks and citation omitted).

11. The court is persuaded that the encounter after the return of the documents was consensual. The court believes that Trooper Trinkle conveyed to Gonzalez-Garcia that he was free to leave after he returned the documents. The comment made by Trooper Trinkle to drive safely coupled with his movement away from the window of the car suggested that the traffic stop had ended. In returning to the window, Trooper Trinkle asked in a conversational tone if he could ask some additional questions. In doing so, he did not physically touch Gonzalez-Garcia or his vehicle, and did not display his weapon. Gonzalez-Garcia readily agreed to answer additional questions. He appeared to do so without reservation. Thus, the court finds no merit to Gonzales-Garcia's argument that he was detained beyond the permissible scope of the stop.

12. Gonzalez-Garcia next contends that the government has failed to demonstrate that he consented to a search of his vehicle. He suggests that the consent was invalid for two reasons: (1) it was obtained while the defendant was detained without reasonable

14

suspicion or probable cause to believe he was committing a crime; and (2) the officer's manner and persistence coerced an involuntary acquiescence to the officer's authority. He also argued that the language barrier prevented a knowing and voluntary consent to search.

13. A defendant who voluntarily consents to a search waives his Fourth Amendment rights, and the police officer may conduct the search without probable cause or a warrant. See Schneckloth v. Bustamonte, 412 U.S. 218, 235 (1973); United States v. Zubia-Melendez, 263 F.3d 1155, 1162 (10th Cir. 2001). The voluntariness of consent must be determined from the totality of the circumstances, and the government bears the burden of proof on the issue. Zubia-Melendez, 263 F.3d at 1162 (10th Cir. 2001). The government must show that there was no duress or coercion, express or implied, that the consent was unequivocal and specific, and that it was freely and intelligently given. Id.

14. The court finds no merit to Gonzalez-Garcia's initial argument. The court does not find that the consent was given while the defendant was detained without reasonable suspicion or probable cause. As noted previously, the encounter engaged in between Trooper Trinkle and Gonzalez-Garcia after the return of the documentation was a consensual encounter. Gonzalez-Garcia was not being detained when the consent was given. He was free to leave, but he chose to remain and answer a few questions. The court fails

15

to find any support for the contention that Gonzalez-Garcia was coerced into providing consent. There is no evidence of coercion or duress. Trooper Trinkle did not threaten Gonzalez-Garcia or use a hostile voice. He did ask Gonzalez-Garcia several times for consent to search the vehicle, but the videotape makes clear that he did so only to make sure that Gonzalez-Garcia understood what he was asking. The court believes that Trooper Trinkle and Gonzalez-Garcia were able to sufficiently communicate to render the consent voluntary. After Gonzalez-Garcia exited his car, he stood nearby and never raised any objection to the search conducted by Trooper Trinkle. The totality of the circumstances indicates that Gonzalez-Garcia voluntarily consented to a search of the car.

15. Finally, the court shall consider Gonzalez-Garcia's argument that Trooper Trinkle exceeded the scope of his consent to search the car. He contends that Trooper Trinkle's actions in dismantling his car exceeded the scope of his consent.

16. The determination of whether a search remains within the boundaries of the consent is a question of fact to be determined from the totality of the circumstances. United States v. Kimoana, 383 F.3d 1215, 1223 (10th Cir. 2004). "The scope of a search is generally defined by its expressed object," Florida v. Jimeno, 500 U.S. 248, 251 (1991), and "is limited by the breadth of the consent given," United States v. McRae, 81 F.3d 1528, 1537 (10th Cir. 1996) (citation omitted). "The standard for measuring the scope of a

16

suspect's consent under the Fourth Amendment is that of 'objective' reasonableness--what would the typical reasonable person have understood by the exchange between the officer and the suspect?" Jimeno, 500 U.S. at 251.

17. Gonazalez-Garcia has suggested, relying on United States v. Osage, 235 F.3d 518 (10th Cir. 2000), that the officers needed to obtain specific consent from him before tearing apart the console of his car. We disagree and find Osage distinguishable here. In Osage, an officer opened a can of tamales found in a suitcase after he had been granted consent to search the suitcase. The Tenth Circuit found that the search had exceeded the scope of consent because the opening of the can destroyed or rendered it useless. Osage, 235 F.3d at 521. Relying on Jimeno, the Tenth Circuit held that "before an officer may actually destroy or render completely useless a container which would otherwise be within the scope of a permissive search, the officer must obtain explicit authorization, or have some other, lawful, basis upon which to proceed." Id. at 522.

18. The court is not persuaded that Osage is applicable. The court does not find that Trooper Trinkle exceeded the scope of the consent to search. The consent led Trooper Trinkle and the other officers to conduct a thorough search of the car. The actions of the officers did not destroy the car or render it useless. The console that was removed could have been reattached. The console

17

was removed simply by loosening several bolts.  In addition, the evidence obtained during the course of the search provided probable cause of a hidden compartment in the car.  This evidence included the officers noticing that the heat shield above the exhaust system appeared to have been removed and the heavy tooling on the bolts to the center console.  The apparent existence of a hidden compartment likely to contain contraband is sufficient to provide probable cause to arrest.  <u>United States v. Stephenson</u>, 452 F.3d 1173, 1178 (10th Cir. 2006).  If a vehicle has a hidden compartment, it is highly likely to contain contraband.  <u>United States v. Jurado-Vallejo</u>, 380 F.3d 1235, 1238 (10th Cir. 2004).  In sum, the court finds no merit to Gonzalez-Garcia's argument that the scope of his consent to search was exceeded.

19. Based upon the foregoing, the court shall deny defendant's motion to suppress.

**IT IS THEREFORE ORDERED** that defendant Gonzalez-Garcia's motion to suppress (Doc. # 11) be hereby denied.

**IT IS SO ORDERED.**

Dated this 16th day of March, 2011 at Topeka, Kansas.

> s/Richard D. Rogers
> United States District Judge